**UNITED STATES of America,**
**Appellee,**

**v.**

**Aris MARIA, aka Luis A. Rivera,**
**Defendant–Appellant.**

**Docket No. 98–1699.**

United States Court of Appeals,
Second Circuit.

Argued June 1, 1999

Decided: Aug. 5, 1999

David A. Lewis, The Legal Aid Society Federal Defender Division Appeals Bureau, New York, NY, for Appellant.

David Greenwald, Assistant United States Attorney, New York, N.Y. (Mary Jo White, United States Attorney for the Southern District of New York, Lewis J. Liman, Assistant United States Attorney, on the brief), for Appellee.

Before: MESKILL and WALKER, Circuit Judges, and TRAGER, District Judge.*

TRAGER, District Judge:

Defendant appeals from a judgment of conviction entered on December 30, 1998,

* The Honorable David G. Trager, United States District Judge for the Eastern District of New York, sitting by designation.

in the United States District Court for the Southern District of New York (Cedarbaum, *J.*). Defendant was charged on September 26, 1996, in a one-count indictment, with illegally reentering the United States without the permission of the Attorney General, in violation of 8 U.S.C. § 1326. On July 31, 1997, defendant entered a plea of guilty to the indictment. On December 7, 1998, the district court sentenced defendant to 70 months' imprisonment, to be followed by two years' supervised release, and a $100 special assessment. The district court ordered that the federal sentence run consecutively to a 48–month State prison term for a violation of parole involving the same illegal re-entry, as well as other misconduct, because of its view that "a concurrent sentence was not permissible under the[ ] circumstances."

## Background

On June 7, 1995, defendant, a native of the Dominican Republic, was deported from the United States for the second time. The deportation followed defendant's New York State convictions in 1994, on separate indictments, for criminal sale of a controlled substance in the second degree in violation of N.Y. Penal Law § 220.41, and criminal possession of a controlled substance in the second degree in violation of N.Y. Penal Law § 220.18, for which he was sentenced to four years to life in prison and subsequently placed on parole. Defendant had previously been deported some eleven years earlier, but had illegally reentered the country at some point thereafter.

Shortly after his second deportation in June 1995, defendant illegally returned to the United States. On November 13, 1995, defendant was arrested in Manhattan after having punched a person in the stomach. The assault resulted in the State's citing defendant for violating the conditions of his parole. Defendant was also charged by the State with violating his parole for having illegally reentered the United States. Defendant was released pending the adjudication of his parole violation.

One month after his November 1995 arrest, defendant was again arrested, this time for entering his wife's apartment without her permission and destroying her property. Defendant's wife had separated from him one month earlier and obtained an order of protection against him because he was often "physically abusive." Defendant was arrested for a third time in January 1996 after defendant again returned to his wife's apartment. When the police arrived in response to defendant's wife's call for help, defendant attempted to evade arrest by hiding on the ledge of a sixth floor window. While doing so, defendant lost his balance and fell six stories, breaking his spine, both hips, his right foot and left arm. Although defendant was not paralyzed by the fall, he suffered serious and debilitating injuries; he now walks with a limp, takes pain medication regularly, and is completely incontinent.

On August 28, 1996, defendant's State parole was revoked, and he was sentenced to four years of imprisonment. New York State authorities also directed that defendant be referred immediately to the Immigration and Naturalization Service ("INS"). After beginning service of a four-year sentence for his violation of parole, defendant was indicted on September 26, 1996 by a federal grand jury in the Southern District of New York for illegal reentry into the United States. Pursuant to a writ of *habeas corpus ad prosequendum*, defendant was transferred to federal custody to face this charge. On April 24, 1997, defendant was arraigned and, on July 31, 1997, defendant entered a plea of guilty.

After defendant entered his guilty plea, the United States Probation Office prepared a Presentence Investigation Report ("PSR") which calculated defendant's Sentencing Guidelines range as 70 to 87 months. Prior to the sentencing proceedings, defendant moved for a downward departure on account of his medical condi-

tion, arguing that that condition made imprisonment more onerous to him—specifically, that his incontinence rendered him subject to "embarrassment and humiliation among the prison population." Defendant also argued that, due to his condition, it would cost far more to incarcerate him than it would the ordinary inmate. After determining that defendant had made no showing that he would receive better care in State custody, in administrative detention pending deportation, at liberty in the Dominican Republic, or under house arrest in the United States than he would in federal prison, the district court denied the application for a downward departure on this ground.[1]

At sentencing, defendant also argued that under United States Sentencing Guidelines ("U.S.S.G.") § 5G1.3(b), the district court was required to impose a concurrent sentence, or, in the alternative, that Application Note 6 to § 5G1.3 did not require the court to impose a consecutive sentence, i.e., that the court retained the discretion to impose a concurrent sentence.

1. At defendant's sentencing hearing, the district court suggested that it might be receptive to deporting defendant back to his native Dominican Republic if he agreed to get on an airplane the day after he finished serving his state sentence. Defendant declined to commit himself to such an alternative to a federal sentence.

2. Defendant also raises two additional arguments: (1) that the district court improperly based its sentence on the defendant's refusal to waive his constitutional and statutory rights to oppose his deportation; and (2) that the district court failed to appreciate the scope of its authority to consider, as a mitigating circumstance upon which to base a departure, defendant's vulnerability and susceptibility to abuse in prison due to his physical condition. Both arguments lack merit. As to the first argument, the conditioning of a downward departure on the surrender of a statutory right to a deportation hearing would not have offended due process. *See United States v. Galvez–Falconi,* 174 F.3d 255, 260 (2d Cir.1999) (holding that, where a defendant makes a showing that the act of consenting to deportation carries "unusual assistance to the administration of justice," district court has authority under U.S.S.G. § 5K2.0 to de-

The district court rejected both arguments and concluded that Note 6 required it to impose a sentence to run fully consecutively to defendant's four-year state sentence.

## Discussion

■ Defendant no longer contends that a concurrent sentence is mandated by U.S.S.G. § 5G1.3(b), but still maintains that the district court erred when it concluded that it did not have the discretion to sentence him to a concurrent sentence under Application Note 6 to § 5G1.3(c).[2] The government argues that the district court correctly determined that Application Note 6 to the Guidelines forecloses the possibility of a concurrent sentence in this case.

### (1)

Section 5G1.3 of the Sentencing Guidelines governs the imposition of a sentence on defendants who have been convicted of committing a crime while subject to an undischarged term of imprisonment for a

part downward in absence of the government's consent). *See generally United States v. Montez–Gaviria,* 163 F.3d 697, 704–05 (2d Cir.1998) (district courts in the Second Circuit have regularly awarded one and two-level departures for consent to deportation). Indeed, "not every burden on the exercise of a constitutional right, and not every pressure or encouragement to waive such a right, is invalid." *Corbitt v. New Jersey,* 439 U.S. 212, 218, 99 S.Ct. 492, 497, 58 L.Ed.2d 466 (1978). Criminal defendants are regularly forced to confront the choice between forgoing the exercise of legal rights and risking stiffer penalties. *See McMann v. Richardson,* 397 U.S. 759, 769, 90 S.Ct. 1441, 1448, 25 L.Ed.2d 763 (1970). That they face such choices does not, alone, offend due process.

As to the second argument, the district court explicitly stated that it was aware of its authority to depart on account of defendant's medical condition, but declined to do so after determining that such a departure was not warranted. As the district court properly recognized that it had the authority to depart, its decision not to exercise that discretion is outside the scope of this Court's reviewing power. *See United States v. Brown,* 98 F.3d 690, 692 (2d Cir.1996).

previous conviction. Subsections (a) and (b) both state mandatory requirements, while subsection (c) is permissive. Subsection (a) provides that the sentence for an offense "committed while the defendant was serving a term of imprisonment (including work release, furlough, or escape status) or after sentencing for, but before commencing service of, such term of imprisonment ... *shall* be imposed to run *consecutively* to the undischarged term of imprisonment." U.S.S.G. § 5G1.3(a) (emphasis added). Under subsection (b), "[i]f subsection (a) does not apply, and the undischarged term of imprisonment resulted from offense(s) that have been fully taken into account in the determination of the offense level for the instant offense, the sentence for the instant offense *shall* be imposed to run *concurrently* to the undischarged term of imprisonment." *Id.* at § 5G1.3(b) (emphasis added).

If neither of subsections (a) or (b) apply, then subsection (c), labeled a policy statement, governs. That subsection provides that "[i]n any other case, the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense." *Id.* at § 5G1.3(c). This provision clearly vests broad discretionary authority in the sentencing court.

**3.** Subsection (a) does not apply in this case because defendant did not commit the offense at issue while serving a term of imprisonment. Subsection (b) does not apply because the prior undischarged term of state imprisonment did not "result from" offenses which have been "fully taken into account" in determining the offense level for the sentence on the new conviction.

**4.** Both parties have assumed that policy statement § 5G1.3(c) and Application Note 6 are binding on the courts. In *Stinson v. United States,* 508 U.S. 36, 41–48, 113 S.Ct. 1913, 1917–20, 123 L.Ed.2d 598 (1993), the Supreme Court explained that Guidelines commentary "that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading

Despite the broad language of § 5G1.3(c), the government contends that Application Note 6 to § 5G1.3 controls the resolution of this case and that Note 6 requires a consecutive sentence. Note 6 states that where a defendant commits a federal offense while on federal or state probation, parole, or supervised release, and such probation, parole, or supervised release has been revoked, "the sentence for the instant offense *should* be imposed to run consecutively to the term imposed for the violation of probation, parole, or supervised release in order to provide an *incremental* penalty for the violation of probation, parole, or supervised release." U.S.S.G. § 5G1.3, Application Note 6 (emphasis added). The government argues that where the conditions of Note 6 are met, Note 6 requires that the sentencing court impose a consecutive sentence.

■ The parties agree that § 5G1.3(c) applies to this case.[3] It is also undisputed that this case presents a factual background squarely within the scenario envisioned by the Sentencing Commission when it drafted Application Note 6. The issue remains whether, in light of the wide discretion granted by subsection (c), Application Note 6 requires the sentencing court to impose a consecutive sentence, or whether the district court retains the discretion to impose a concurrent or partially concurrent sentence.[4]

of, that guideline." *Stinson,* 508 U.S. at 41–48, 113 S.Ct. at 1917–20. *See also United States v. Torres–Echavarria,* 129 F.3d 692, 698–99 (2d Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1177, 140 L.Ed.2d 185 (1998). It follows that not *all* policy statements have binding force. Specifically, policy statements that do not accompany, interpret or explain a sentencing guideline and that clearly indicate the Sentencing Commission's intent not to be binding are only advisory. *See, e.g., United States v. Anderson,* 15 F.3d 278, 284 & n. 6 (2d Cir.1994) (policy statements in Chapter 7 of the Guidelines are advisory because they do not accompany a Guideline, and are prefaced by a discussion making manifest their advisory nature).

We have yet to rule on whether the policy statement at issue here, § 5G1.3(c), is binding

### (2)

■ As § 5G1.3(c) contemplates a grant of discretion to the sentencing court, the district court's conclusion that imposition of a consecutive sentence was required by Application Note 6 can only be affirmed if Note 6 is, in fact, mandatory. As this involves a purely legal question concerning the proper application of a Guideline, the district court's decision will be reviewed de novo. *See United States v. Kirvan*, 86 F.3d 309, 311 (2d Cir.1996) (citation omitted).

■ The Sentencing Guidelines "hav[e] the force and effect of law, [and] are to be construed as if they were a statute, giving the words used their common meaning, *absent a clearly expressed manifestation of contrary intent*." *Id.* (citing *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981)) (emphasis added). *See also Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980) ("Absent a clearly expressed legislative intention to the contrary, [statutory] language must ordinarily be regarded as conclusive."). Thus, we must start with the language of the statute. *See id.; Bailey v. United States*, 516 U.S. 137, 144, 116 S.Ct. 501, 506, 133 L.Ed.2d 472 (1995).

The critical language in Note 6 is the word "should." Also of significance is the meaning of the word "incremental." Turning first to the meaning of "should," the district court concluded, and the government here argues, that "should" means "shall." Under that interpretation, a district court would, indeed, lack the discretion to sentence a parole violator to a concurrent federal sentence for the parole-violating offense. Such an interpretation, however, does not accord the word its plain and common meaning.

■ Webster's Dictionary defines the phrase "should be" as something "that ought to be." Webster's Third New Int'l Dictionary 2104 (1st ed.1993). *See also* Black's Law Dictionary 1379 (6th ed. 1990) ("[The word 'should'] ordinarily impl[ies] duty or obligation; *although usually no more than an obligation of propriety or expediency*.") (emphasis added). In contrast, the word "shall" is "used to express a command or exhortation," and is "used in laws, regulations, or directives to express what is mandatory." Webster's Dictionary, at 2085. *See also* Black's Law Dictionary, at 1375 ("As used in statutes, contracts, or the like, this word is generally imperative or mandatory."). Thus, the common meaning of "should" suggests or recommends a course of action, while the ordinary understanding of "shall" describes a course of action that is mandatory. In the absence of a clear manifestation of intent on the part of the Sentencing Commission to attribute to "should" a meaning contrary to the common one, the term should be given its usual meaning. *See Kirvan*, 86 F.3d at 311.

While the government argued at oral argument that every use of "should" in the Guidelines means "shall,"[5] this is not, in fact, the case. This Court has previously determined that "should," when used within the context of a Sentencing Guidelines provision, does not mean "shall." For example, in *United States v. Harris*, 13 F.3d 555 (2d Cir.1994), this Court held that the use of "should" in § 4A1.3 of the Guidelines did not create a mandatory provision, but rather offered sentencing courts "guidance." *Id.* at 559. Section 4A1.3 provides that when a court makes "an upward departure from Criminal History Category

---

under the standard set forth in *Stinson. See United States v. Whiteley*, 54 F.3d 85, 88 (2d Cir.1995) (declining to rule on whether precursor to subsection (c) was binding). For the purposes of this opinion, we need not decide whether § 5G1.3(c), or Application note 6 pertaining thereto, is binding.

5. There, the government cited Application Note 7 to § 2F1.1 and Note 5 to § 2B1.1 as examples from the Guidelines where "should" has been interpreted to mean "shall."

VI, the court *should* structure the departure by moving incrementally down the sentencing table to the next higher offense level in Criminal History Category VI until it finds a guideline range appropriate to the case." U.S.S.G. § 4A1.3 (emphasis added). We read this provision as "merely suggesting an approach," and contrasted the Guidelines' use of "should" in § 4A1.3 with "must" and "shall," compulsory terms not used by the Sentencing Commission in drafting that provision. *Id.* Similarly, in *United States v. Whiteley*, 54 F.3d 85, 88–90 (2d Cir.1995), in evaluating the meaning of Application Note 3 to § 5G1.3, this Court relied upon the Sentencing Commission's use of the phrase "should consider" in lieu of "shall impose," the language used in the preceding version of the Note, in concluding that Note 3 was permissive rather than mandatory. Thus, the government's argument that every use of "should" in the Guidelines actually means "shall" has already been rejected by this Court.

■ Here, as in *Harris* and *Whiteley*, it is concluded that where the Sentencing Commission chose the word "should" instead of "shall" or "must," the Commission meant what it said and said what it meant. As a general matter, the use of different words within the same statutory context strongly suggests that different meanings were intended. *See Crockett Telephone Co. v. F.C.C.*, 963 F.2d 1564, 1570 (D.C.Cir. 1992) (use of words "may" and "shall" in same provision shows them to have their usual, different meanings); *Persinger v. Islamic Republic of Iran*, 729 F.2d 835, 843 (D.C.Cir.1984) (use of different language in different parts of same statute creates strong inference that different meanings were intended); 2A N. Singer, Sutherland on Statutory Construction § 46.07 (5th ed.1992 and Supp.1996) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended."). As discussed above, "should" implies, sug-

gests, and recommends, but does not require. The use of "should" in Application Note 6 provides a sentencing court with the discretion to take a course of action not suggested by the Note, should that court conclude that the circumstances of a given case warrant such a deviation. The government's suggested approach is unduly "mechanistic" and would impose a "straightjacket" on sentencing judges. *Harris*, 13 F.3d at 559 (quotation and citation omitted).

Nor are we aware of anything in the placement in the statutory scheme or the history of the Guidelines that would lead to a contrary result. Our reading of Note 6 is wholly consistent with the general grant of discretion in § 5G1.3(c). Subsection (c), which is a catch-all provision, generally vests broad discretion in the sentencing court in those situations not governed by subsections (a) and (b). Under subsection (c), the sentencing court *"may "* sentence a defendant in any of three ways: concurrently, consecutively, or partially concurrently. U.S.S.G. § 5G1.3(c) (emphasis added). Note 6 strongly expresses the Commission's judgment that persons who violate the terms of their probation, parole or supervised release by committing federal offenses *should* be given a consecutive sentence. The difference between "may" and "should" is significant, and it should be taken into consideration by a district court in determining an appropriate sentence, but this difference, alone, does not suggest any inconsistency between subsection (c) and Note 6.

Moreover, Note 6's cross reference to U.S.S.G. § 7B1.3 interprets § 7B1.3 as setting forth a policy that "any imprisonment penalty imposed for violating probation or supervised release *should* be consecutive to any sentence of imprisonment being served or subsequently imposed." U.S.S.G. § 5G1.3, Application Note 6 (emphasis added). This does not suggest a contrary interpretation of Note 6. Indeed, Application Note 4 to § 7B1.3 expressly states that it is the Commission's "recom-

mendation," not requirement, "that any sentence of imprisonment for a criminal offense that is imposed after revocation of probation or supervised release be run consecutively to any term of imprisonment imposed upon revocation." U.S.S.G. § 7B1.3, Application Note 4.

■ Further supporting this reading of Note 6, defendant convincingly argues that the use of the word "incremental" in Note 6 to describe the penalty to be imposed upon a violator of probation, parole or supervised release evinces an intent to impose a moderate additional penalty and not a fully consecutive sentence. Defendant's argument is bolstered by the fact that the words "incremental penalty" or "incremental punishment," when used in the Guidelines, generally mean a moderate additional penalty producing a total punishment amounting to less than the full aggregation of all available penalties. Indeed, in contrast to the different meanings of the word "should" in the Guidelines, it appears that every time the word "incremental" is used in the Guidelines, it means modest. For example, the Multiple Count rules in Chapter 3 of the Guidelines provide for the imposition of an "incremental punishment for significant additional criminal conduct." U.S.S.G. Ch.3, Pt.D, intro. comment. This Court has explained that these "incremental penalties ... produce a total sentence significantly less than what would have resulted if the sentences were calculated for each count separately and then aggregated." *United States v. Mizrachi,* 48 F.3d 651, 654 (2d Cir.1995); *see also United States v. MacLeod,* 80 F.3d 860, 867–69 (3d Cir.1996) (noting that "[t]he introductory commentary to [Chapter 3, Part D] indicates that its aim is to 'provide incremental punishment for significant additional criminal conduct,'" and holding that "'the amount of additional punishment [is to] *decline* [ ] as the number of offenses increases.'") (quoting U.S.S.G. Ch.3, Pt.D, intro. comment.). In addition, § 4A1.3 states that when a defendant is in Category VI, a district court departing upward

"should structure the departure by moving incrementally ... to the next higher offense level in Criminal History Category VI until it finds a guideline range appropriate to the case." U.S.S.G. § 4A1.3. This Court has held that criminal history departures above Category VI will be reviewed for reasonableness, and that a district court need not follow a "rigid" approach. *See United States v. Harris,* 13 F.3d 555, 558–59 (2d Cir.1994). Thus, the concept of an "incremental" departure is more consonant with the notion of a modest increase. This reinforces the notion that the word "should" should be interpreted as giving district courts discretion.

The government responds to these arguments without contesting the fact that "incremental" is used in the Guidelines as synonymous with modest sentencing departures. Rather, the government argues that simply because the Commission used "incremental punishment" to describe a modest additional penalty in Chapter 3 does not mean that "incremental" has the same meaning in Application Note 6. Once again, the government asks that the plain and common meaning of the language employed by the Sentencing Commission be ignored in the absence of a clear expression of contrary intent. The government's invitation to adopt a tortured statutory interpretation of the words "should" and "incremental"—one that would require the imposition of a consecutive sentence—is declined, and it is concluded that a sentencing court retains the discretion under Note 6 to sentence a defendant concurrently or partially concurrently.

(3)

In reaching this conclusion, this Court declines to follow decisions of the First, Fifth and Ninth Circuits relied upon by the government to support its position that Note 6 states a mandatory requirement. *See United States v. Alexander,* 100 F.3d 24, 26–27 (5th Cir.1996) (per curiam); *United States v. Gondek,* 65 F.3d 1 (1st

Cir.1995); *United States v. Bernard,* 48 F.3d 427 (9th Cir.1995).[6]

In *Alexander* and *Gondek,* the Fifth and First Circuits, addressing the Sentencing Commission's use of "should" in Application Note 6 to § 5G1.3(c), concluded that "should" meant "shall" because "[n]o qualification is stated or suggested" anywhere else in the text of the Note. *Gondek,* 65 F.3d at 3. *See also Alexander,* 100 F.3d at 27. However, the Sentencing Commission's use of "should" instead of "shall" strongly suggests the existence of the very qualification that the First and Fifth Circuits found not to exist. The Commission knows how to draft a mandatory provision when it intends to. *See, e.g.,* U.S.S.G. § 5G1.3(a), (b). Indeed, both subsections 5G1.3(a) and (b) contain the word "shall" and, thus, state imperatives. Here, however, the Commission opted to use the non-mandatory term "should." This would appear to be clear evidence of an express qualification. Therefore, to conclude that Note 6 contains no qualification or reservation would be to replace the Sentencing Commission's judgment with our own, i.e., to decide that the Commission meant "shall" when it said "should."

The remaining rationales asserted by the First and Fifth Circuits for finding Note 6 to be mandatory are also unpersuasive. For example, the First Circuit in *Gondek* found the situation envisioned in Note 6 to be "closely akin" to the case of a defendant who commits a new offense while serving a term of imprisonment, the situation contemplated by subsection (a), simply because Note 6 too envisions a new offense. *Gondek,* 65 F.3d at 3. *See also Alexander,* 100 F.3d at 27. This logic, however, overlooks the critical distinction between subsection (a) and Note 6—that subsection (a) applies to persons serving terms of imprisonment, such as furlough, escape status, and work release, while Note 6 applies to persons on probation, parole and supervised release. It is analytically probable, and more consistent with the use of the word "should" in the statutory scheme, that the Sentencing Commission considered crimes committed by persons on work release, furlough, or escape status to be incrementally more serious than crimes committed by persons on probation, parole or supervised release and, accordingly, chose to require a consecutive sentence in the former case, but merely to recommend it in the latter. Nor does the First Circuit adequately explain why, if the Sentencing Commission had indeed intended to require a consecutive sentence in situations envisioned by Note 6, it did not either amend subsection (a) to include federal offenses in violation of parole, probation or work release, or reword Note 6 to require unambiguously a consecutive sentence.

Significantly, not all circuits to have addressed the issue of a sentencing court's *discretion* to impose a concurrent sentence when, as in this case, a defendant committed a new offense while on parole, have concluded that Note 6 mandates a consecutive sentence. Although the present issue was not before the court, Chief Judge Posner of the Seventh Circuit Court of Appeals assumed that Application Note 6 creates only a "strong *presumption* in favor of consecutive sentencing." *United States v. Walker,* 98 F.3d 944, 945 (7th Cir.1996) (emphasis added). In *United States v. Carver,* 160 F.3d 1266 (10th Cir.1998), the Tenth Circuit recently noted, in dicta, that it is not clear that a sentencing court is "stripped" under Note 6 of the discretion to impose a concurrent federal sentence. *Id.* at 1268 n. 1. The Tenth Circuit viewed

**6.** The Ninth Circuit did not specifically address the interpretive issues raised on this appeal or addressed by the Fifth and First Circuits. Rather, that Court concluded, without explanation, that "it is clear" that Application Note 4, now Note 6, requires consecutive sentences. *Bernard,* 48 F.3d at 431. *See* *also United States v. Gilcrist,* 106 F.3d 297 (9th Cir.1997). At the time that *Gondek* and *Bernard* were decided, current Application Note 6 was numbered as Application Note 4 in the Guidelines manual. *See* U.S.S.G. § 5G1.3 (1994).

**74**

with "some skepticism" a claim that a district court "was wholly without discretion to impose a concurrent sentence." *Id.*

### Conclusion

The district court's judgment of conviction is vacated insofar as it imposed a consecutive sentence under the view that Application Note 6 required the result and the case is remanded for resentencing in light of this decision.