**David A. SCHOLL, Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

No. 00–737C.

United States Court of Federal Claims.

Dec. 4, 2002.

Corrected Version Filed: Dec. 17, 2002.

## OPINION [1]

BASKIR, Judge.

Pending before the Court in this civilian back pay case, filed by U.S. Bankruptcy Judge David A. Scholl in 2000, is the Defendant's motion to dismiss for failure to state a claim upon which this Court may grant relief. Because we hold that Judge Scholl had a

---

1. This is a corrected version of the Opinion issued on December 4, 2002. Note the minor corrections on Pages 3 and 4, as indicated in bold-faced font. We apologize to Ms. Slawsky for the Court's error with her name.

firm right—absent other factors which we will explore in further proceedings—to be reappointed as a U.S. Bankruptcy Court Judge for the Eastern District of Pennsylvania, **the Plaintiff's complaint is properly before this Court. Thus, for the reasons stated below, the Defendant's motion to dismiss is DENIED.**

## I. Background

### A. Judge Scholl's Application for Reappointment

Before discussing the issues raised by the Government's motion, we set forth as background the events surrounding Judge Scholl's application for reappointment. While this background is of limited relevance to the disposition of the pending motion, it does provide context to the dispute. None of the facts below are contested.

Pursuant to 28 U.S.C. § 152(a) (1984), the U.S. Court of Appeals for the Third Circuit (Third Circuit) appointed David A. Scholl to a 14–year term as a U.S. Bankruptcy Judge for the Eastern District of Pennsylvania on August 27, 1986. From 1994 to 1999, Judge Scholl served as Chief Bankruptcy Judge. Bankruptcy judges serve on a full-time basis, and for the duration of his term, Judge Scholl, like all bankruptcy judges, was paid an annual salary at a rate of 92% of the salary of U.S. District Court judges. *See* 28 U.S.C. § 153.

In August of the thirteenth year of the Judge's term, Mr. Francis F. Szczebak, the Chief of the Bankruptcy Judges Division of the Administrative Office of the United States Courts (AO), notified Judge Scholl and Third Circuit Chief Judge Edward R. Becker that Judge Scholl's term was nearing its end. The AO's letter informed Chief Judge Becker that the self-described "regulations" of the Judicial Conference of the United States (JCUS) provide procedures for the reappointment, in the event the incumbent judge is interested, or, in the event that he or she is not, for the selection and appointment of a new bankruptcy judge. The AO's letter also contained a document entitled the "Timeline for Reappointment Process," which is attached to this Opinion in Appendix A. We discuss these regulations in greater detail below.

In response to the AO's letter, and in compliance with the regulations, on December 29, 1999, Judge Scholl timely notified Chief Judge Becker of his "willingness" and desire to be reappointed for a second term as a bankruptcy judge. Judge Scholl also enclosed his executed AO application form (Form "PER 74") with the letter.

Sometime prior to March 1, 2000, and still pursuant to the regulations, the active judges of the Third Circuit conducted a preliminary vote to determine whether or not to proceed with the reappointment process. By a memorandum dated March 1, 2000, Chief Judge Becker informed all active Third Circuit judges that the Court had initially approved Judge Scholl's application and would go forward with the required "public comment period" concerning his reappointment. Judge Scholl does not take issue with the processing of his application to this point.

On March 2, 2000, the first public notice was sent to area newspapers and periodicals; bar associations; libraries; Third Circuit district, magistrate, and bankruptcy judges; and posted on the AO's and Third Circuit's internet websites. The March 2nd notice stated, in part, that:

> The United States Court of Appeals for the Third Circuit is considering the reappointment of Judge Scholl to a new term of office and *has determined that he appears to merit reappointment subject to public notice* and opportunity for public comment.

Public Notice for Reappointment of a Bankruptcy Judge, Mar. 2, 2000 (emphasis added).

The public comment period, which by JCUS regulation may not exceed 45 days, was set to expire on April 14, 2000.

Despite this apparently wide distribution, the Notice did not appear in the local newspaper of greatest circulation, *The Philadelphia Inquirer*, nor was it published in *The Legal Intelligencer*, the daily legal newspaper published for the bench and bar in the Philadelphia area.

Shortly before the close of the public comment period, on April 6, 2000, the judges of the Third Circuit adopted and issued their

own regulations to supplement those adopted by the JCUS. In addition to seeking comments from the public, the Third Circuit now required that the Third Circuit Executive send out a detailed questionnaire to attorneys who appeared before the candidate judge during the three years prior to the end of the judge's term. **The Circuit Executive, Ms. Toby D. Slawsky, requested** that the Clerk of the Bankruptcy Court compile a list of all attorneys who met this criterion. It is at this stage that Judge Scholl begins to take issue with the processing of his application.

The technology of the Eastern District Bankruptcy Court was no match, however, for the Third Circuit's "questionnaire" regulation. The Bankruptcy Court's Clerk's Office apparently could not segregate those attorneys' names nor produce such a specified list. **Therefore, on April 11, 2002, Ms. Slawsky suggested, and Chief Judge Becker** concurred, that the Third Circuit send the questionnaire to the 500 members of the Third Circuit Bankruptcy Conference and to a more focused list of attorneys and non-attorney litigants who had appeared only in specific proceedings, such as Chapter 11 and Chapter 13 cases.

Accordingly, on two dates, April 6 and sometime after April 12, the Third Circuit circulated a questionnaire containing 35 detailed questions to approximately 1,165 individuals. For 24 of the questions, the respondent was asked to rate Judge Scholl on a scale of 0–5. Eleven additional questions required the respondent to provide an overall evaluation of the candidate and to rate his or her experience before the Judge. There was also a provision for narrative comments. The Third Circuit extended the public comment period 21 days past the original deadline prescribed by the JCUS.

The public comment period concluded on May 5, 2000. Only 278 individuals submitted completed questionnaires. **Ms. Slawsky tabulated the number** of responses in the various categories as well as ranked the percentages of the marks in those categories. **Ms. Slawsky did not provide Judge Scholl** with copies of the actual questionnaires. According to Judge Scholl, **he received from Ms. Slawsky the** summary "chart reflecting answers from 278 respondents …, 316 comments, and a covering letter" on Thursday afternoon, May 11, 2002. Pursuant to the Third Circuit's supplemental regulations, he was given an opportunity to respond to the public's "negative comments."

Four days later, Judge Scholl submitted a detailed, ten-page response letter on May 15, 2000, the due date. His response discussed his tenure and service as a bankruptcy judge, addressed the procedures used by the Third Circuit in seeking public comment, and responded to, by Judge Scholl's calculation, the 54 "negative" comments, approximately 4% of the questionnaires distributed.

In reply, Chief Judge Becker informed Judge Scholl on May 19, 2000, that the Court had received Judge Scholl's response and that pursuant to JCUS regulation, an active Third Circuit judge had requested that the Court of Appeals conduct a second vote on Judge Scholl's reappointment. The vote occurred on May 24, 2000, and its outcome was not favorable. Chief Judge Becker informed Judge Scholl by telephone that the Third Circuit had refused to reappoint him, and confirmed this result by letter dated May 25, 2000. The Chief Judge offered no formal or even informal explanation for the Court's adverse decision.

## B. Procedural History

Not satisfied with this outcome or with the procedures used by the Third Circuit, Judge Scholl requested that Chief Judge Becker conduct a hearing "where [Judge Scholl] can be informed of the reasons for his non-retention and challenge their sufficiency." Letter from Judge Scholl's attorneys Cletus P. Lyman and Kenneth A. Jacobsen to Chief Judge Edward R. Becker, dated June 28, 2000 (citing *Perry v. Sindermann*, 408 U.S. 593, 603, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)). In addition, Judge Scholl's attorneys sent a letter to the AO's General Counsel's Office.

On behalf of the Third Circuit, and in response to the letter sent to the General Counsel's Office, Mr. William R. Burchill, Jr., the Associate Director and General Counsel of the AO, notified Judge Scholl's attorneys

on July 14, 2000, that the Judge's request for a hearing had been denied and that his term would end as previously scheduled in August of 2000. Several further communications ensued between Judge Scholl and the AO regarding the Judge's belief that procedural flaws affected his reappointment process. In the AO's final letter, Mr. Burchill stated:

> I should reiterate that the Court of Appeals has taken final action and this matter must therefore be considered closed.

Letter from Mr. Burchill to Messrs. Lyman and Jacobsen, July 28, 2000.

Prior to the end of his term, Judge Scholl filed suit in this Court (case number 00–506C), asserting that he had a firm right of reappointment, and seeking restoration and reappointment to his office. In December of 2000, after his first term had ended, and in response to informal objections by the Department of Justice that his complaint was premature, Judge Scholl voluntarily dismissed that suit. His term having now expired, he immediately filed the instant case with a similar complaint, again seeking restoration to office and his statutorily entitled pay for the second term. In addition, Judge Scholl asserts that his Constitutional rights to due process were violated, and that the Third Circuit failed to follow proper administrative procedure in the reappointment process. The Defendant's pending motion to dismiss for failure to state a claim upon which relief may be granted was filed, briefed, and argued in due course.

## II. Discussion

It is appropriate to grant a motion to dismiss under Rule 12(b)(4) (now Rule 12(b)(6) under the Court's May 2002 revised rules) for failure to state a claim upon which relief may be granted when the facts asserted by the claimant do not under the law entitle him to a remedy. *See New Valley Corp. v. United States*, 119 F.3d 1576, 1579 (Fed.Cir.1997). In reviewing the Defendant's motion, we are mindful that we must "assume that all well-pled factual allegations are true" and make all reasonable inferences in favor of Judge Scholl, the nonmovant. *Highland Falls–Fort Montgomery Cent. Sch. Dist. v. United States*, 48 F.3d 1166, 1169–70

(Fed.Cir.1995). The Court may not dismiss Judge Scholl's complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). For the purposes of resolving this motion, as noted above, the facts and factual inferences are not in dispute and thus resolution hinges on a purely legal question of regulatory interpretation.

### A. Subject Matter Jurisdiction

The U.S. Court of Federal Claims is a "court of special and, therefore, limited jurisdiction." *Blazavich v. United States*, 29 Fed. Cl. 371, 373 (1993). We may only hear suits against the Government and then only to the extent that Congress has by statute waived sovereign immunity. *See United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941). This Court's primary jurisdictional statute states that a suit may only be brought if it is:

> founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1)(1994).

Known as the Tucker Act, this provision merely provides a waiver of sovereign immunity, and does not, standing alone, create any substantive right of recovery for money damages. To bring an action against the United States, a Plaintiff must also demonstrate a separate substantive right pursuant to a money mandating provision. See *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980); *United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). Finally, the burden of establishing jurisdiction falls upon the party asserting jurisdiction. *See Rohmann v. United States*, 25 Cl.Ct. 274, 277 (1992).

Historically, the Court's Tucker Act jurisdiction extended to Federal civilian pay claims because the Supreme Court has held that statutes which specify a salary to be paid to individuals for their personal services

are considered to be money mandating provisions. *See United States v. Fausto,* 484 U.S. 439, 453–54, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988) and *United States v. Wickersham,* 201 U.S. 390, 400, 26 S.Ct. 469, 50 L.Ed. 798 (1906). As my colleague Senior Judge James F. Merow has stated:

> The theory of recovery [is] that in cases of improper discharge, an employee's dismissal [is] void due to the government's improper behavior and therefore plaintiff [is] entitled to the pay provided pursuant to the statute.

*Khan v. United States,* 1998 U.S. Claims LEXIS 332, \*14, *aff'd,* 201 F.3d 1375 (Fed. Cir.2000).

While Congress altered this jurisdictional mandate with the passage of the Civil Service Reform Act in 1978, Pub.L. 95–454, 92 Stat. 1111 (CSRA), with respect to civilian employees of the Executive Branch, the parties have not suggested that this act is a bar to jurisdiction in this case, a back pay claim from an officer of the Judicial Branch. *See, e.g., Hatter v. United States,* 38 Fed.Cl. 166 (1997), *rev'd in part,* 203 F.3d 795 (Fed.Cir.2000), *aff'd in part, rev'd in part,* 532 U.S. 557, 121 S.Ct. 1782, 149 L.Ed.2d 820 (2001).

Although Judge Scholl's complaint asserts procedural and Constitutional violations, these are jurisdictional grounds for actions in District Court. As respects this Court's jurisdiction, the Plaintiff asserts that he was improperly denied a second term in contravention of the JCUS reappointment regulations, and thus that the Court has the authority to grant monetary relief pursuant to the statute providing compensation for bankruptcy judges, 28 U.S.C. § 153. Judge Scholl's claim for his salary is both retroactive and prospective. The Back Pay Act, 5 U.S.C. § 5596 (1994), applies to employees of the Federal court system, and affords this Court the authority to award back pay for the period prior to the date of judgment, if this Court finds that the Plaintiff was improperly denied his salary. While technically the Court car not order prospective pay, a plaintiff can always file successive back pay claims for the future years.

The Defendant argues in response that this Court cannot grant the monetary relief claimed because the Court cannot appoint Mr. Scholl to the bankruptcy court, and therefore argues that the Plaintiff's claim is barred by *Testan,* 424 U.S. at 392, 96 S.Ct. 948. In *Testan,* two Government attorneys filed suit in the U.S. Court of Federal Claims, seeking to reclassify their positions to a higher grade on the Federal pay scale. In dismissing the attorney's claims, the Supreme Court stated:

> The present action ... is not one concerning a wrongful discharge or a wrongful suspension. In that situation ... the employee is entitled to the emoluments of his position until he has been legally disqualified.... There is no claim here that either [claimant] has been denied the benefit of the position to which he was appointed. The claim, instead, is that each has been denied the benefit of a position to which he should have been, but was not, appointed. The established rule is that one is not entitled to the benefit of a position until he [or she] has been duly appointed to it.

*Id.* at 402, 96 S.Ct. 948 (citations omitted).

Here, however, the Plaintiff is not seeking the benefit of a position to which he wasn't appointed. Unlike *Testan,* this case is about whether or not Judge Scholl, as the incumbent officeholder, had a firm right to be *reappointed* to his position as a bankruptcy judge. The Defendant agreed at oral argument that if Judge Scholl had such a right, then he is statutorily entitled to compensation. *Testan,* therefore, is not dispositive.

Thus, we must interpret the language of the JCUS regulations and determine if they vested a reappointment right in the incumbent judge. In doing so, we are guided by other courts which have interpreted similar language. It is also helpful to analyze the administrative context surrounding these regulations.

### B. Textual Interpretation

We begin our analysis of the regulations' text with a short introduction to its history and legislative context. We will expand on this context in more detail below.

While the bankruptcy court system is over 20 years old, the regulations under which

Judge Scholl applied for reappointment arise out of Section 303 of the Federal Courts Improvement Act of 1996 (FCIA), Pub.L. 104–317, 110 Stat. 3847, 3852. Section 303 expresses a clear Congressional preference for judicial continuity and reads in pertinent part:

> When filling vacancies, the court of appeals may consider reappointing incumbent bankruptcy judges under procedures prescribed by regulations issued by the Judicial Conference of the United States.

It is not surprising that Congress would vest such responsibility in the Judicial Conference. The JCUS dates to 1922, when Congress "charged a body of judges (eventually called the Judicial Conference of the United States) to make policy for the federal judiciary." JUDITH RESNIK, *Trial as Error, Jurisdiction as Injury: Transforming the Meaning of Article III*, 113 HARV. L. REV. 924, 937–38 (2000). The "Conference's governance power was bolstered in 1939, when the creation of the Administrative Office provided [it] with a support staff within the judiciary rather than the executive branch." RUSSELL R. WHEELER, ORIGINS OF THE ELEMENTS OF FEDERAL COURT GOVERNANCE 15 (1992) (noting that "current statutes vest many specific federal court governance duties" in the AO's director).

The JCUS and AO responded to Section 303 of the FCIA by amending previously promulgated regulations for the selection, appointment, and reappointment of bankruptcy judges. In fact, the March, 1997 amendments, which are the operative regulations at issue here, were the fifth version since the JCUS first promulgated them in 1984. *See* Regulations of the Judicial Conference for the Selection, Appointment, and Reappointment of United States Bankruptcy Judges, *reprinted in* THE SELECTION, APPOINTMENT, AND REAPPOINTMENT OF UNITED STATES BANKRUPTCY JUDGES, Judges Information Series No. 3, AO Office of Judges Programs (May 1998) ("Regulations" or "JCUS Regulations"). Interestingly, since this lawsuit was filed, there have been two more amendments to the reappointment regulations. *See* Regulations, Amendments of Sept. 2000 and Mar. 2001. This makes a total of 7 revisions in 17

years, or approximately 1 every 2 years on average. We understand that regulation drafting is a difficult and inexact art and draw no inference from this regulatory inconstancy.

The March 1997 chapter dealing with the reappointment process reads:

> The court of appeals will decide whether or not to reappoint the incumbent judges. In making the decision, the court of appeals shall take into consideration the professional and career status of the incumbent. ***Reappointment should not be denied unless*** *the incumbent has failed to perform the duties of a bankruptcy judge according to the high standards of performance regularly met by United States bankruptcy judges.*

Regulations, § 5.01(b) Methods, *as amended,* Mar. 1997 (emphasis added).

The remainder of the regulations outline the process the Circuit is to follow: the initial vote of the court; the public comment process; and the opportunity for an active judge to request a second vote of the appeals court. Individual circuits are allowed to supplement these regulations with their own implementing procedures, as the Third Circuit did. If a second vote is not requested, the regulations state that:

> After due consideration of the comments from the bar and public, the court of appeals *shall reappoint* such incumbent bankruptcy judge.

*Id.* at § 5.03(a) Decision of the Court of Appeals (emphasis added).

It is no reflection to observe that this language is less than clear—there have been, as we observed, two later revisions, which we visit towards the end of this Opinion. However, we are constrained to give the actual "words used" by the Judicial Conference their "ordinary meaning." *Moskal v. United States,* 498 U.S. 103, 108, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990) (citations omitted).

The key question is whether the phrase "should not be denied unless" is a mandatory requirement or simply a suggestion, what in legal nomenclature is described as non-mandatory or "directory." The U.S. Court of Appeals for the Federal Circuit has dis-

cussed how to make this determination, and what consequences flow from it:

> [W]hen a provision in a statute instructs a governmental official in the exercise of an official duty, whether the statutory provision is directory or mandatory depends on several factors, which in turn govern the consequences of lapse by the official.
>
> Generally put, mandatory provisions are essential to the substance of the law to which they relate. . . .
>
> The converse characterizes directory provisions: lack of strict compliance does not injure any substantive right, and the underlying proceeding is not invalidated by lack of compliance.

*Exxon Chem. Patents, Inc. v. Lubrizol Corp.,* 935 F.2d 1263, 1267–68 (Fed.Cir.1991) (Newman, J., concurring) (citing C.D. SANDS, SUTHERLAND STAT. CONSTR., Ch. 57 (4th ed.1973)).

This is not a mere exercise in linguistics. "[L]egal rights flow from mandatory, not directory, requirements" and "mandatory regulations ... 'have the force and effect of law.'" *New England Tank Indus. v. United States,* 861 F.2d 685, 694 (Fed.Cir.1988) (citing *Nordstrom v. United States,* 169 Ct.Cl. 632, 638, 342 F.2d 55 (1965) and quoting *U.S. ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 265, 74 S.Ct. 499, 98 L.Ed. 681 (1954)). The Supreme Court has stated that where the legislature or agency uses "language of an unmistakably mandatory character," then it "has created a protected liberty interest." *Hewitt v. Helms,* 459 U.S. 460, 471–72, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983).

Thus, if this language is mandatory, then the regulations vested in Judge Scholl a firm right to be reappointed, and he may seek back pay, unless and until the Third Circuit fulfilled the condition subsequent—that he had "failed to perform the duties of a bankruptcy judge according to the high standards of performance regularly met by United States bankruptcy judges." On the other hand, if the language is directory, or permissive, then the judges of the Third Circuit had discretion to reappoint or not reappoint the incumbent judge, and Judge Scholl has no right to the position and its pay.

We must, therefore, as an initial matter explore the meaning of the word "should." It is an exercise that Humpty Dumpty would glory in.

Taken by itself, the word "should" has several different meanings. First, it is the past tense of "shall." AMERICAN HERITAGE DICTIONARY 1262 (3rd ed.1997). Second, it is used to "express obligation or duty." *Id.* The third definition, and probably the most common usage, is that it is used to "moderate the directness or bluntness of a statement." *Id.; see also* WEBSTER'S NEW INTERNATIONAL DICTIONARY 2104 (3rd ed.1993). Finally, it can be used to say that one "ought to" do something. FOWLER'S NEW MODERN ENGLISH USAGE 711 (3rd ed.1996). In contrast, the word "shall" is commonly used "to express a command or exhortation" that is "mandatory." WEBSTER'S at 2085.

Since these dictionary definitions are divided between at least two incompatible meanings, we look to judicial authority for guidance. Help, unfortunately, does not come from that quarter either. Courts have long differed over whether "should," as used in a legislative or regulatory environment, is mandatory or directory.

For example, many courts have analyzed this question in connection with the guidelines for prison sentences issued by the U.S. Sentencing Commission. The Sentencing Guidelines for defendants who commit a felony while on probation or parole, and who have that supervised release revoked, state that "the sentence from the instant offense *should be* imposed to run consecutively to the term imposed for the violation of probation" or parole. U.S.S.G. § 5G1.3, n. 6 (emphasis added); *see also United States v. Rosario,* 134 F.Supp.2d 661, 666 (E.D.Pa.2001).

The Circuit Courts, in reviewing District Court decisions on this particular guideline, are deeply divided as to whether or not the sentencing judge has discretion to impose a concurrent, as opposed to a consecutive, sentence. The First, Fifth, Eighth, and Ninth Circuits have all held that "should" is mandatory, and that the judge has no discretion to depart from consecutive sentencing. *See United States v. Gondek,* 65 F.3d 1, 2–3 (1st Cir.1995); *United States v. Alexander,* 100

F.3d 24, 26–27 (5th Cir.1996); *United States v. Goldman*, 228 F.3d 942, 944 (8th Cir.2000); and *United States v. Bernard*, 48 F.3d 427, 431 (9th Cir.1995).

On the other hand, the Second, Seventh, and Tenth Circuits have held that the Guidelines are merely suggestive, and that a judge may impose either consecutive or concurrent sentences. *See United States v. Maria*, 186 F.3d 65, 70–73 (2d Cir.1999); *United States v. Walker*, 98 F.3d 944, 945 (7th Cir.1996) (noting, however, that a strong presumption exists in favor of consecutive sentencing); and *United States v. Carver*, 160 F.3d 1266, 1268, n. 1 (10th Cir.1998). Interestingly, in at least one of the cases, the United States took the position that "should" was mandatory language and "argued at oral argument that every use of 'should' in the Guidelines means 'shall.' " *Maria*, 186 F.3d at 70. The Government is not "estopped" from advancing a different argument in this Court, and we are, of course, reviewing a different regulation.

While the Federal Circuit has obviously not spoken to the issue of these prison sentences, it has weighed in on how it views the word "should." In one of its opinions discussing the differences between mandatory and directory language, the Federal Circuit off-handedly noted that the regulation it was analyzing "err ploy[ed] mandatory terms such as 'will not' and 'will' rather than directory terms such as 'should.' " *New England Tank*, 861 F.2d at 694.

Two final points should (sic) be kept in mind. First, as every law student learns, "may" is almost always, but not invariably, discretionary, while "shall" is sometimes discretionary and sometimes mandatory—and predicting which will be the ultimate meaning in any particular case is never easy. Second, as every veteran, husband, and parent knows, the mandatory nature of "should" depends on its interlocutor. "Private, you *should* shine your boots" from a sergeant; "Honey, you *should* take out the garbage" from a wife; and "Son, you *should* clean your room" from a parent leave no doubt as to their import.

However interesting and ambiguous this excursion into the meaning of "should" may be, it is not particularly relevant to our purposes, and we apologize to the reader if we have misled you. In the regulation we review, the word does not stand alone and, while the Government urges us to, we cannot divorce it from its phrasing context.

The regulation reads "... reappointment *should not be denied unless ....*" Regulations, § 5.01(b). Employing a negative command, the Judicial Conference instructed that the court of appeals "should not" do something—should not deny an incumbent's reappointment, unless a condition subsequent was fulfilled. The formulation of this section, therefore, was not simply a grant of authority, but an instruction to do a thing accompanied by a negative limitation. In explaining the impact of negative language on mandatory and directory regulations, *Sutherland Statutory Construction*, the treatise relied upon by Judge Newman in *Exxon Chemical*, explains:

> "One of the strongest indications of what construction should be given a statutory provision may be found in the use of negative, prohibitory, or exclusionary words. Where statutory restrictions are couched in negative terms they are usually held to be mandatory.... Negative words in a grant of power should never be construed as directory. *Where an affirmative direction is followed by a negative or limiting provision, it becomes mandatory.*"

Norman J. Singer, Sutherland Stat. Constr., § 57.09 (5th ed.1992) (emphasis added).

The appeals court's authority to reappoint is specifically limited in this regulation by the inclusion of a negative limitation and a condition subsequent. We believe that, read together, this language—"not be denied unless"—had the effect of converting what might otherwise be read as a directory suggestion—"should" standing alone—into a mandatory legal requirement.

## C. Contextual Analysis

Just as we cannot read "should" as a stand-alone word, we also cannot divorce the analysis of the reappointment regulation from its administrative and statutory context

and history. Indeed, as the Federal Circuit has stated, "statutory interpretation is a 'holistic endeavor' that requires consideration of a statutory scheme in its entirety." *Vectra Fitness, Inc. v. TNWK Corp.*, 162 F.3d 1379, 1383 (Fed.Cir.1998) (quoting *United Sav. Ass'n v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988)). We turn now in more detail to that statutory scheme, which involves a review of the constitution and reconstitution of the bankruptcy court system in the 1980s and 1990s.

The 1997 amendments to the JCUS reappointment regulations arose out of the 1996 Federal Courts Improvement Act. The existing statutory provisions for bankruptcy judges, however, predate that act. Congress created the current system in 1984, primarily as a reaction to the Supreme Court's decision in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 85–86, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), which held that the then-prevailing system of bankruptcy judges violated Article III of the U.S. Constitution. *See* Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 333, *codified in part* at 28 U.S.C. §§ 151–158 ("1984 Act" or "Bankruptcy Act"). The Supreme Court found that bankruptcy judges had exercised certain powers which were reserved for Article III courts. It emphasized that bankruptcy judges were not Article III judges because they did not enjoy lifetime tenure. 458 U.S. at 61, 102 S.Ct. 2858. While they were nominated by the President and subject to Senate confirmation, bankruptcy judges in the pre–1984 system served for only 14 years.

In its reconstruction of the bankruptcy court system, Congress specifically established bankruptcy courts as judicial bodies inferior to Article III courts. The judges would be known as "judicial officers of the District Courts" appointed for a 14–year term by the court of appeals of the judicial districts in which they are located. 28 U.S.C. § 152(a). As with the 1984 Bankruptcy Act, the FCIA of 1996 tasked the Judicial Conference with writing the regulations for the appointment process.

In both the 1984 Act, and the regulations that followed, Congress and the JCUS set up a merit selection process for new bankruptcy judges that stressed professional qualifications and personal character. This process is still in use for new judges. As the 1996 Senate Judiciary Committee Report accompanying the FCIA stated:

> The Bankruptcy Amendments and Federal Judgeship Act of 1984 articulated strict, specifically detailed ethical and scholastic standards for the selection of U.S. bankruptcy judges to ensure that such selections are governed by merit, character, and scholastic ability. This act also requires that the judicial council for each circuit, or a merit selection panel, if so convened by the council, to screen and review the qualifications of applicants, using strict criteria specified by both the Act and by accompanying regulations issued by the Judicial Conference of the United States. These procedures are thorough and time-consuming, both for the applicants and the reviewers.

S. REP. No. 366., 104th Cong., 2nd Sess., 33 (1996), U.S.Code Cong. & Admin.News 1996, pp. 4202, 4213.

Indeed, those are the *minimum* requirements. The JCUS regulations also required applicants to have at least five years of law practice experience or prior service as a judge or magistrate, undergo Federal Bureau of Investigation and Internal Revenue Service background investigations, as well as a complete disclosure of all financial holdings. To aid the courts of appeals in considering applications, Congress "delegated the screening function to Judicial Councils" and "Merit Selection Panels" that each Circuit could establish. *Bason v. Judicial Council of the District of Columbia Circuit*, 86 B.R. 744, 745 (D.D.C.1988).

When the Supreme Court had invalidated the earlier system, it stayed the effect of its decision to allow Congress time to act. As part of its response to the *Northern Pipeline* decision, and in an effort to provide continuity, Congress provided a generous "sunset" provision for sitting bankruptcy judges. It extended their terms by 4 years from the date of the judge's last appointment, for a

period not to exceed 26 months beyond the date of enactment. 1984 Act, § 106(a). Further, the 1984 Act included a provision—section 120(a)(2)—"encourag[ing]" the courts of appeals to "grandfather" sitting judges for appointment under the new statute. H.R. REP. No. 798, 104th Cong., 2nd Sess., 22 (1996).

This section, no more than a policy preference, expressed "the sense of Congress that the courts of appeals should consider for appointment under [28 U.S.C. § 152], to the first vacancy which arises after the date of the enactment of this Act in the office of each bankruptcy judge, the bankruptcy judge who holds such office immediately before such vacancy arises." 1984 Act, § 120(a)(2). *See also Bason*, 86 B.R. at 748–51 (the D.C. District Court refused to grant a temporary injunction prohibiting the new appointee from taking the oath of office on the basis that Section 120(a)(2) did not grant the non-reappointed bankruptcy judge a protected property interest in reappointment).

In 1984, however, Congress did not provide for the reappointment of future incumbent judges, that is to say, judges initially appointed after 1984. As a result, if bankruptcy judges were to be considered for another term, they had to undergo the same selection process described above on equal terms with newcomers. This, of course, posed not only administrative and other hassles for the incumbent judge, but it also meant that his or her application would be judged in competition with other candidates. This system did not allow for even a presumption of reappointment, much less "squatter's rights." It was altogether possible that an incumbent judge could be rejected in favor of another candidate with more impressive credentials.

Consequently, 12 years later, with the FCIA of 1996, Congress amended the Bankruptcy Act to permit the courts of appeals to consider the reappointment of bankruptcy judges using procedures "that differ from the initial appointment of bankruptcy judges." S. REP. NO. 366 at 33, U.S.Code Cong. & Admin.News 1996, pp. 4202, 4213. The amendment gave the Judicial Conference the authority to design streamlined reappoint-ment procedures. We restate the provision for the reader's convenience:

> When filling vacancies, the court of appeals may consider reappointing incumbent bankruptcy judges under procedures prescribed by regulations issued by the Judicial Conference of the United States.

FCIA, § 303.

The Defendant argues that the "may consider" language is directory, and thus that the Third Circuit did not even have to consider Judge Scholl at all. Alternatively, it is perhaps also possible to interpret this language as saying that the Circuit Court shall consider Judge Scholl's application, but is free to follow or disregard the JCUS regulations. We find both interpretations persuasive of the linguistic dexterity of their author, but in no other way.

The language is identical to the 1984 Act's language for the appointment of a new judge. Just as Congress directed that the JCUS issue regulations for new appointments, so it now directed the JCUS to issue regulations for reappointments. *See* 1984 Act, § 120(b). Second, the Third Circuit actually followed the JCUS reappointment regulations and, moreover, supplemented those regulations with several additional procedures. The Third Circuit did not choose to disregard the Judicial Conference regulations.

The Government has offered no documentary support or practical illustration that any Circuit Court has considered itself free to disregard applications for reappointment, or to consider those applications in disregard of the JCUS regulations. We understand this legislative text to mean nothing more profound than that the JCUS was authorized but not necessarily commanded to issue uniform regulations in this matter.

In any event, as noted, the Judicial Conference did in fact promulgate the regulations that stated that the incumbent "should not be denied" reappointment "unless" he or she "ha[d] failed to perform ... according the high standards of performance regularly met by United States Bankruptcy Judges." Regulations, § 5.01(b). The JCUS also devised the process we outlined at the start.

This new system upended the prior lengthy reapplication process that was necessary under the 1984 Act. Under the JCUS requirements, the incumbent judge was the only candidate considered—the position was never posted and no other applications would be accepted. In essence, the 1996 Amendment afforded the incumbent judge considerable practical advantages over potential newcomer competitors. As the House Judiciary Committee Report on the FCIA stated:

> [FCIA Section 303] amends the [1984 Bankruptcy Act] to authorize the Judicial Conference to prescribe regulations which provide for the reappointment of incumbent bankruptcy judges that differ from the initial appointment of bankruptcy judges....
>
> *[The first time rigorous application] procedures are unnecessary, however, in the case of applicants who are incumbent bankruptcy judges.* The information regarding an incumbent's merit, scholarship, judicial temperament, etc., is no longer a matter which a judicial council or a merit screening panel need attempt to ascertain; they are facts, amply supported by a fourteen-year-old record. Thus, this section simply eliminates unnecessary expenditures of time and money....
>
> The failure to provide provisions concerning the reappointment of future incumbents (i.e., incumbents reappointed after the filling of first vacancies following the 1984 Act) with waiver of the fact-finding procedures appears to be an oversight [of the 1984 Act].

H.R. REP. No. 798 at 22–23 (emphasis added).

Judge Scholl argues, quite persuasively, that this legislative change, coupled with the updated regulations issued by the JCUS, created a presumption that the incumbent judge had a firm right to reappointment, subject only to the "unless" limitation. The Plaintiff also asserts that this scheme would parallel the "for cause" removal standards outlined in 28 U.S.C. § 152(e). A bankruptcy judge can only be removed by a majority vote of the court of appeals, and only for "incompetence, misconduct, neglect of duty, or physical or mental disability." *Id.* Whether or not that parallelism is literally or legally true, it is clear that the Judicial Conference placed the incumbent in so preferred a position that only by a demonstration that he or she had "failed to perform," could the reappointment be denied.

Finally, while we do not rest our conclusion on this point, we take some comfort in the fact that we are not alone in our reading of the Judicial Conference's regulations. The Administrative Office Bankruptcy Judges Division wrote and published a pamphlet for the courts of appeals, the judicial councils and the merit selection panels to help "guide" them in "their responsibilities in the bankruptcy judge selection process." THE SELECTION, APPOINTMENT, AND REAPPOINTMENT OF UNITED STATES BANKRUPTCY JUDGES at 1–2. The AO uses "unmistakably mandatory language" to describe the procedures for reappointment:

> It is *presumed* that reappointment of an incumbent will not be denied unless the incumbent has failed to perform the duties of a bankruptcy judge according to the high standards of performance expected of a United States bankruptcy judge.

> .   .   .   .   .

> After the court of appeals considers the comments from the bar and public, it *must* reappoint the incumbent bankruptcy judge, unless an active judge of the court [requests a second vote].

Chapter 13 at 29 (emphasis added).

Even though the Director of the Administrative Office is under the supervision of the Judicial Conference, and the AO provides support to the JCUS, we take this only to be a contemporaneous staff understanding, not otherwise binding authority.

We do believe the AO had it right when it described Judge Scholl's reappointment as a "presumption." The history of the bankruptcy judge system, and the administrative context of the regulations at issue are completely consistent with our textual interpretation and support our holding that Judge Scholl had a firm right to be reappointed as a judge, absent the showing that he had failed to perform according to high standards.

## III. Coda

We would be remiss if we did not complete the record by including a short discussion of the twice revised, post–1997 amended reappointment regulations.

The major concern of the JCUS Committee on the Administration of the Bankruptcy System in September 2000 appears to have been providing more time and procedural flexibility to the individual courts of appeals. The Committee also added language to the regulations' preamble that states that they "set forth procedural guidelines that create no vested rights for any incumbent or prospective bankruptcy judges." Regulations, Preamble, *as amended,* Sept. 2000. However clear that language may be, the Committee did not remove the "reappointment should not be denied unless" language. It also did not change the other procedures (the initial vote, the public comment, and the possible second vote) that we discussed above.

Approximately six months later, in March 2001, the JCUS met and once again revised Section 5 of the reappointment regulations. According to the "Report of the Proceedings" from the March 14, 2001, meeting of the Judicial Conference, the JCUS made these additional changes to the reappointment chapter in order to:

(a) clarify that court of appeals will consider an incumbent bankruptcy judge who seeks reappointment before considering other qualified candidates; [and]

(b) *remove a phrase from section 5.01(b) that might appear to create a presumption of reappointment.*

JCUS Report of Proceedings at 8–9, Mar. 14, 2001 (emphasis added).

The phrase referred to in this note is, of course, the "should not be denied" language that today we hold did, in fact, vest a firm right of reappointment in Judge Scholl.

These new amendments also eliminate the initial vote of the court of appeals and provide that if the incumbent judge is interested in reappointment, the Circuit Court will proceed directly to a period of public comment. The regulations further clarify that reappointment will only occur if a majority of the appeals court votes in favor of the incumbent, and that if the Court does not reappoint the incumbent, it will proceed to the JCUS procedures for new applicants.

Most important for our purposes, the amended regulations, as currently formulated, now state:

> The court of appeals shall decide whether or not to reappoint the incumbent judge before considering other potentially qualified candidates. In making this decision, the court of appeals shall take into consideration the professional and career status of the incumbent, and whether the incumbent has performed the duties of a bankruptcy judge according to the high standards of performance regularly met by United States bankruptcy judges and demonstrated those characteristics and qualifications specified in Sec. 1.01 and Sec. 1.02(b) of these regulations.

Regulations, § 5.01(b) Methods, *as amended,* Mar. 2001.

## IV. Conclusion

Because Judge Scholl had a firm right to reappointment, he has stated a claim upon which relief may be granted. **We hereby DENY the Defendant's Rule 12(b)(4) motion.** In doing so, we have followed the Supreme Court's "rule that a complaint *should not be dismissed ... unless* it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley,* 355 U.S. at 45–46, 78 S.Ct. 99 (emphasis added).

**The parties are hereby ORDERED to submit a Joint Status Report, outlining a schedule for further proceedings, no later than January 20, 2003.**

**IT IS SO ORDERED.**